IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | |
|---|---|
| v. | CRIMINAL<br>NO. 19-186 |
| ALIZE M. RAMOS-COLON | |

**MEMORANDUM**

**SCHMEHL, J.** */s/ JLS*                                                                                 June 3, 2021

Defendant was indicted by a federal grand jury for two counts of production of child pornography, in violation of 18 U.S.C. § 2252(a); four counts of distribution of child pornography, in violation of 18 U.S.C. § 2252(a)(2), (b)(1); one count of receipt of child pornography, in violation of 18 U.S.C. § 2252(a)(2), (b)(1); and one count of possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(b), (b)(2). Claiming that she was subjected to an un-*Mirandized* custodial interview conducted during the execution of a warrant to search her family's home on February 22, 2019, Defendant moves to suppress any and all physical evidence recovered, as well as any and all statements made by her. The Court held an evidentiary hearing on the motion to suppress. For the reasons that follow, the motion is denied.

I. **FACTS**

On October 24, 2018, the National Center for Missing and Exploited Children (NCMEC) received a cyber-tip from Google that an individual uploaded child pornography videos and images to a Google Drive account. Google advised NCMEC that

the digital device which uploaded these files was using the email address ramosalize@gmail.com, with an associated telephone number of 484-548-4722, and used an IP address serviced by Sprint.

NCMEC forwarded the information to the Pennsylvania State Police. Corporal Michael Fegley reviewed the information, including the videos and images, and confirmed that they depicted children engaged in sexually explicit conduct.

On December 3, 2018, a subpoena was served on Sprint for subscriber information related to the IP address that was used at the date and time that the videos and images were uploaded to Google Drive. On December 7, 2018, Sprint responded to the subpoena and provided subscriber information for a Wanda Ramos, Northampton County, Pennsylvania.

PSP Trooper James Ford obtained a search warrant to search the Ramos residence for evidence including, but not limited to, computer hardware, software, electronic storage devices (including mobile telephones and computers), passwords, and data security devices. The warrant was executed at approximately 6:00 a.m. on February 22, 2019. Trooper Ford and five other members of the Pennsylvania State Police Southeast Computer Crime Task Force were present during the search including two forensic analysts. The search team was not in police uniforms but were wearing vests identifying themselves as police. Wanda Ramos answered the door and let officers inside the residence. Ramos-Colon resided in the residence and was home during the search execution. An adult male was sleeping in the entry room in a reclining chair.

Upon securing the residence, Ford advised the adult occupants, including Ramos-Colon, that he was conducting a search of their home pursuant to a search warrant

because someone uploaded illegal digital files to the internet. Ford also informed them that no one was under arrest and they were free to leave at any time. He then asked for their cooperation with his investigation, to which they agreed and provided the location of electronic devices in the home.

Trooper Ford first interviewed Wanda Ramos in the kitchen area, where she stated her Sprint account was active and her daughter, Alize Ramos-Colon, also used the account. Ford asked Ramos for Ramos-Colon's phone number and Ramos provided the number, which was the same number associated with the Google account reported to NCMEC.

Trooper Ford then interviewed Ramos-Colon in the kitchen area where she was again told that she was not under arrest and did not have to cooperate with the investigation. Trooper Ford asked a few preliminary questions and informed Ramos-Colon that her phone was utilized in the commission of a crime involving uploading child pornography. At this point, Trooper Ford did not consider Defendant to be a suspect.

Trooper Ford asked Ramos-Colon who had access to her phone and if she permitted anyone else to use it. She denied anyone else had access, except for her little brother. Trooper Ford then asked her if she would mind if he looked at the phone. Ramos-Colon agreed and handed Trooper Ford her phone. The phone was locked and Trooper Ford asked her if she would mind unlocking it. He handed the phone back to her and she agreed. Ramos-Colon unlocked the phone and handed it back to Trooper Ford. During their conversation, the phone kept auto-locking. Trooper Ford asked Ramos-Colon if she minded if he changed the security setting so it would not do so. She agreed and punched in her passcode to authorize. When looking through images on the phone,

Trooper Ford observed an image depicting the arm of a person touching the private area of a child. The arm had a distinctive tattoo and matched the tattoo on Ramos-Colon's arm that was in plain sight of Trooper Ford while he was interviewing her. When he observed the sexually explicit image and the tattoo, he asked Ramos-Colon if the image was of her. She admitted it was and stated, "I did that." Trooper Ford again informed Ramos-Colon she was not under arrest and did not have to cooperate.

Trooper Ford asked Ramos-Colon if she was willing to take a polygraph at the State Police barracks. She agreed. Trooper Ford then requested permission to record the rest of their interview. Ramos-Colon agreed. At approximately 6:28 a.m., the audio recording started and lasted approximately five minutes. Ramos-Colon confirmed she was 18 and resided in the residence. She was informed again there were inappropriate files uploaded to Google involving minors and asked if she knew anything about the photos. Ramos-Colon immediately admitted she took the photographs. Immediately upon disclosure, Trooper Ford once again reminded Ramos-Colon that she was not under arrest and did not have to cooperate. She agreed to continue speaking with Trooper Ford and reiterated that she took the inappropriate photographs. She admitted she used her mobile phone and claimed she did not use any other device. She stated no one else was present when she took the photographs and that no one forced her to take the photographs. Trooper Ford then stated he was going to end the conversation because Ramos-Colon had agreed to take a polygraph. The interview ended at 6:33 a.m.

At the Pennsylvania State Police barracks, starting at approximately 7:27 a.m., Corporal Webb conducted the polygraph examination where he again advised Ramos-Colon of the voluntary nature of the examination and informed her of her *Miranda* rights.

Ramos-Colon signed a waiver of her rights and a polygraph consent form. Ramos-Colon was given a PSP Sex Offense Survey where she admitted performing sexual acts on children, recording the abuse in videos and images, and distributing them to an unidentified man whom she met online. Ramos-Colon also admitted she sent some of the sexually explicit images to an unknown woman at the direction of the unidentified man.

## II. DISCUSSION

"As a general rule, the burden of proof is on the defendant who seeks to suppress evidence. However, once the defendant has established a basis for his motion, i.e., the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995) (citations omitted). The government's burden carries a preponderance of the evidence standard. *United States v. Fautz*, 812 F. Supp. 2d 570, 609 (D.N.J. 2011) (citing *United States v. Matlock*, 415 U.S. 164, 178 n.14 (1974)).

Defendant argues that she was coerced into unlocking her mobile device, and that even if she did consent to unlock her mobile phone, the officer's search of that phone exceeded her consent. She also argues that her confession to law enforcement, both at her home and the police station, was made in violation of *Miranda*. As will be discussed more fully below, I find all of Defendant's contentions to be incorrect. Therefore, her motion to suppress will be denied.

### A. Did the Government search the contents of Defendant's mobile phone in violation of the Fourth Amendment?

The Fourth Amendment protects against "unreasonable searches and seizures" and requires that warrants issue based only upon a finding of probable cause. *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). Generally, a warrantless search is unreasonable,

unless a specific exception to the warrant requirement applies. *United States v. Price*, 558 F.3d 270, 277 (3d Cir. 2009). A specifically established exception is a search that is conducted pursuant to consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *United States v. Stabile*, 633 F.3d 219, 231-32 (3d Cir. 2011). When the government justifies a search based on consent, the government bears the burden of proving that the consent was "freely and voluntarily" given. *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968). Courts consider a variety of factors when considering voluntariness, including "the age, education, and intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter; the repetition or duration of the questioning; and the use of physical punishment." *Price*, 558 F.3d at 278.

First, law enforcement had a search warrant to search all electronic devices in the residence. This included a pat down of persons located within the residence at the time of the search for electronic devices. As Defendant and her mobile device were in the location to be searched, law enforcement already had authorization to search Defendant's mobile device pursuant to the warrant. However, the warrant did not include compelling Defendant to unlock her phone to be searched. Accordingly, I must determine whether Defendant consented to Trooper Ford's access of her phone and whether said consent was freely and voluntarily given as opposed to being coerced.

Whether a defendant's consent is coerced "is a question of fact to be determined from the totality of the circumstances." *United States v. Williams*, 898 F.3d 323, 332 (3d Cir. 2018). As set forth above, in order to assess the voluntariness of Defendant's consent, I must consider Defendant's age and intelligence, whether she was advised of

her constitutional rights, the length of the encounter, the repetition or duration of the questioning and the use of physical punishment. *See id.*

In examining these factors, I first note that Defendant was not advised of her constitutional rights, which goes against a finding of voluntary consent. I also note that Defendant testified that she obtained a GED in 2017 after dropping out of school in the 8th or 9th grade. Defendant was 18 years old at the time of the search, which although considered a legal adult, is admittedly young. Also, Defendant makes much of the presence of multiple law enforcement officers in the kitchen of her home as she was talking to Trooper Ford. However, those are the only factors that come down in Defendant's favor as to the voluntariness of her consent to have her phone examined.

First, the length of the encounter was short. The search began at 6:00 a.m. and Defendant sat down with Trooper Ford to begin a discussion less than 30 minutes later. Similarly, the repetition or duration of the questioning was short. Trooper Ford did not repeatedly ask Defendant the same questions, nor did he sit her down for hours and question her. The entire encounter at her home lasted 33 minutes or less, as Trooper Ford ended his recording of their conversation at 6:33 a.m. In addition, there was clearly no use of physical punishment or force whatsoever. Furthermore, the police did not conduct themselves in an inappropriate manner. They were conducting a search trying to locate and identify a suspect and did not initially believe that Defendant was the one for whom they were looking.

I find that an evaluation of the totality of the circumstances leads to the conclusion that Defendant freely and voluntarily consented to a search of her phone. Her consent was not coerced as to create a Fourth Amendment violation. Taking all the

circumstances into consideration, I find that Defendant voluntarily consented to have her phone searched.

The next issue raised by Defendant is the scope of said search. Defendant argues that even if she consented to unlock her phone, it was only to access and search her Gmail account and that Trooper Ford exceeded the scope of her consent by opening and scrolling through her Google photos.

"When a warrantless search is authorized by voluntary consent, the extent of that search is limited to the terms of the consent." *United States v. Birt*, 120 F. App'x, 424, 428 (3d Cir. 2005) (*citing United States v. Kim*, 27 F.3d 947, 956 (3rd Cir. 1994)). "[A] consensual search satisfies the mandates of the Constitution only if conducted within the boundaries of the consent given." *United States v. Williams*, 898 F.3d 323, 329 (3d Cir. 2018). In determining the limits of an individual's consent, courts must determine what a "typical reasonable person [would] have understood by the exchange between the officer and the suspect." *Id.* (*quoting Florida v. Jimeno*, 500 U.S. 248, 251 (1991)). "The scope of a search is generally defined by its expressed object." *Jimeno*, 500 U.S. at 251.

Defendant argues that she never provided consent to search her entire phone. Rather, she claims that Trooper Ford asked her "about only her email address, and then told her to open her Gmail account." ECF No. 30, p. 10. Defendant argues that based upon this exchange, an objective person would reasonably expect Trooper Ford to search Defendant's email account only, not to search through photos on a different application on her phone. However, Trooper Ford testified that he requested permission to look at Defendant's phone and she handed it to him, and realizing that it was locked, he asked her to unlock it, which she did. Trooper Ford did not ask Defendant if he could look at

8

her email on her phone; rather, he testified that he asked "Can I search your phone?" to which Defendant nodded and handed her phone to him. Trooper Ford testified that he did not qualify his request by asking to search Defendant's email only. The object of interest in this search was Defendant's phone, not Defendant's email. Accordingly, I find that Trooper Ford did not exceed the scope of Defendant's consent when he examined photos contained on her phone. Evidence located on Defendant's phone is admissible and was not obtained in violated of the Fourth Amendment.

### B. Was Defendant subjected to a custodial interrogation during which she made statements to Trooper Ford in violation of *Miranda*?

Next, Defendant argues that her interrogation in her kitchen was custodial and that she was not given *Miranda* warnings first. In *Miranda v. Arizona*, the Supreme Court held that the "in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Georgison v. Donelli*, 588 F.3d 145, 154 (2d Cir. 2009) (*quoting Miranda v. Arizona*, 384 U.S. 436, 467 (1966). In order to protect against the coercive nature of custodial interrogations, the Supreme Court required that individuals be advised of their constitutional rights— including the right to an attorney and the right to remain silent—prior to questioning. *See Miranda*, 384 U.S. at 444.

*Miranda* safeguards are "required only when a person has been deprived of his or her freedom in some significant way," *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999), i.e., when an individual is subject to custodial interrogation, *see Rhode Island v. Innis*, 446 U.S. 291, 298 (1980). Whether statements are the product of custodial interrogation is a fact-specific inquiry. *See Leese*, 176 F.3d at 743. Agents "are not

required to administer *Miranda* warnings to everyone whom they question." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). In the instant matter, the Government does not dispute that Trooper Ford's questioning of Defendant was an interrogation. Rather, the Government focuses on whether Defendant was in custody at the time she made certain admissions.

" '[C]ustody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion . . . ." *Howes v. Fields*, 132 S. Ct. 1181, 1189 (2012). To determine whether a person is in custody, courts must examine "all of the circumstances surrounding the interrogation." *Id.* Whether questioning by agents constitutes custodial interrogation is decided on a case-by-case basis. *Leese*, 176 F.3d at 743. The test is an objective, not subjective, one. *Stansbury v. California*, 511 U.S. 318, 323 (1994) ((finding a defendant interviewed at a police station was not "in custody" for Miranda purposes). Put differently, " '[t]wo discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.' " *Yarborough v. Alvarado*, 541 U.S. 652, 662 (2004) *quoting Thompson v. Keohane*, 516 U.S. 99, 112 (1995). A formal arrest is not necessary for a finding of custody, but if no arrest is made, "something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates they would not have heeded a request to depart or to allow the suspect to do so." *United States v. Willaman*, 437 F.3d 354, 359 (3d Cir. 2006) (citation and quotation omitted).

The Third Circuit has identified five features of an interview courts should consider and balance when determining if a person was in custody:

> (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.

*United States v. King*, 604 F.3d 125, 138 (3d Cir. 2010) *quoting Willaman*, 437 F.3d at 359-60. More recently, the Supreme Court has itself identified factors relevant to the "custody" analysis. They include "the location of the questioning, its duration, statements made [by law enforcement] during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." *Howes*, 132 S. Ct. at 1189 (citations omitted). Accordingly, I must examine the situation at hand using these five factors to determine whether Defendant was in custody.

### 1. Defendant was told that she was free to leave and not under arrest

The facts as revealed at the hearing in this matter indicate that at no time did Trooper Ford tell Defendant that she was under arrest, was not free to leave, or was required to speak with him. As testified to by Trooper Ford, when he entered the home, he told everyone that he was investigating the uploading of illegal files to the internet, that they were not under arrest, and that they were free to leave. When Trooper Ford determined that the cell number from which the images had been uploaded belonged to Defendant and he spoke with her in the kitchen, he reiterated to her that he was investigating online illegal activity regarding child pornography and that she did not have to cooperate with him. After Trooper Ford found a photograph depicting child

11

pornography on Defendant's phone, he once again told her that she did not have to cooperate with him. When Trooper Ford recorded the second part of his interview with Defendant, he again told her that she was not under arrest and did not have to cooperate.

In total, Trooper Ford told Defendant that she was not under arrest and did not have to cooperate at least four times, one of which was confirmed via the audio recording he made of the second half of his interview with Defendant. There is no evidence of record whatsoever that Defendant was told that she was required to speak with Trooper Ford or that she wasn't free to leave. Accordingly, this factor weighs heavily in favor of a noncustodial interrogation.

### 2. The interrogation took place in Defendant's home

The interview took place in the kitchen of Defendant's own home, not in a police station. Defendant was repeatedly told that she was free to leave. The fact that she was interviewed in her own home also weighs in favor of a noncustodial interrogation. *See United States v. Ritchie*, 35 F.3d 1477, 1485 (10th Cir. 1994) (no custody where suspect interviewed in his own living room); *United States v. Scott*, 590 F.2d 531, 532-533 (3d Cir. 1979) (defendant not in custody where two ATF agents, proceeding without a search or arrest warrant, traveled to defendant's home, questioned defendant, and invited him to come to their office); *United States v. Crawford,* 52 F.3d 1303, 1308-1309 (5th Cir. 1995) (defendants not in "custody" where FBI agents questioned defendants at their place of employment during execution of search warrant, even though agents did not tell defendants they were free to leave, and defendants were not allowed to walk from room to room without being accompanied by an agent).

### 3. The interrogation lasted only minutes

Officers executed the search warrant on Defendant's family home and Defendant

gave the statements in question to Trooper Ford less than 30 minutes after the execution of the warrant. The entire interaction with Defendant, including the interview, lasted less than one and a half hours prior to the polygraph and *Miranda* warnings. Only a small portion of that time involved Defendant's consensual interview in her home. Interviews of greater duration have frequently been found to be non-custodial. *See United States v. Killingsworth*, 118 Fed. Appx. 649 (3d Cir. 2004) (unpublished) (reversing order suppressing statements); *see also Yarborough*, 541 U.S. at 656 (two hours); *Beckwith v. United States*, 425 U.S. 341, 342-45 (1976) (three hours); *King*, 604 F.3d at 138 ("several hours"); *United States v. Wolk*, 337 F.3d 997, 1006-07 (8th Cir. 2003) (an hour and twenty minutes); *United States v. Czichray*, 378 F.3d 822,825 (8th Cir. 2004) (seven hours); *Leese*, 176 F.3d at 744-45 (one hour); *United States v. Jones*, No. 11--261, 2011 WL 4011406, at *3 (E.D. Pa. September 8, 2011) (Schiller, J.) (nine hours); *United States v. McKinney*, 695 F. Supp. 2d 182, 191 (E.D. Pa. 2010)(agents' search in defendant's house lasted five hours, with questioning separated by as much as three hours and lasting between thirty and forty-five minutes). In fact, prior to the discovery of the image depicting her tattooed arm molesting a child, Defendant was not even a suspect. As stated earlier, they initially did not think Defendant was the subject in question. After telling her she was not under arrest and did not need to cooperate, she was asked a series of questions lasting only minutes which she voluntarily answered.

### 4. The officers used no coercive tactics during the interrogation

Defendant's interview with Trooper Ford was demonstrated to be calm, cooperative, and non-confrontational. Defendant was in no way forced to speak with Trooper Ford, nor was any physical restraint or force used. Although law enforcement was present in her kitchen during her interview with Trooper Ford, they were not in any

way blocking her exit from the kitchen. This factor also weighs in favor of a noncustodial interrogation.

### 5. Defendant voluntarily submitted to questioning by Trooper Ford

Defendant cooperated with Trooper Ford and voluntarily made the statements in question, as discussed more fully above. After originally not even being a suspect, she was told multiple times that she did not have to cooperate with Trooper Ford and was not under arrest. She continued to voluntarily speak to and cooperate with law enforcement.

A review of the five factors above shows that Defendant's interview with Trooper Ford was voluntary and non-custodial. Accordingly, *Miranda* warnings were not necessary prior to law enforcement speaking with Defendant and the statements that she made to Trooper Ford in her kitchen are admissible.

### C. Was Defendant's Post-*Miranda* Statement at the Police Station Made Voluntarily?

Next, Defendant argues that her statements given at the police station must be suppressed because the officers used a deliberate two-step interrogation technique, her midstream *Miranda* warnings were ineffective, and her waiver and statements were involuntary. First, as I found that the statements given to Trooper Ford in her home were given voluntarily in a non-custodial situation, Defendant's arguments about the two-step interrogation technique and the midstream *Miranda* warnings must fail. This type of argument is relevant to a situation where a defendant makes an unwarned admission, is then *Mirandized* and then subsequently repeats or adds to the admission post-*Miranda* after continued police questioning. *See United States v. Shaird*, 463 F. App'x 121, 123 (3d Cir. 2012). That is not the current situation. Rather, Defendant made voluntary statements in a non-custodial situation, was *Mirandized* and then made additional

statements. Therefore, the argument that the post-*Miranda* statements should be suppressed because of the alleged two-step interrogation technique is denied. The only remaining issue is whether Defendant's waiver of her *Miranda* rights and post-*Miranda* statements were voluntary.

Defendant argues that because of the nature of the interrogation and her "youth and vulnerability," her waiver of rights was not voluntary, knowing, or intelligent, and her statements were a result of coercion, despite the *Miranda* warnings that she was given. (ECF No. 30, p. 32.)

The question of voluntariness is whether a "defendant's will was overborne when [s]he confessed" so as to deprive her of the "ability to make an unconstrained, autonomous decision to confess." *Miller v. Fenton*, 796 F.2d 598, 603-04 (1986). In determining the voluntariness of a confession, courts "examine the totality of the circumstances," including "'who initiated the [initial] interrogation, the time that elapsed between the two interrogations, the extent to which the same police were involved in both interrogations, the manner in which the [initial] interrogation was conducted,' and any other relevant factors." *United States v. Latz*, 162 F. App'x 113, 120 (3d Cir. 2005) (quoting *United States v. Tyler*, 164 F.3d 150, 158 (3d Cir. 1998)). Such other relevant factors in the voluntariness analysis may include the youth of the suspect, her lack of education or low intelligence, and her prior dealings with the criminal justice system. *Bradley*, 370 F. Supp. at 475 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973), *Oregon v. Bradshaw*, 462 U.S. 1039, 1046 (1983) (plurality opinion); *United States v. Velasquez*, 885 F.2d 1076, 1086 (3d Cir. 1989)).

There is no evidence that Defendant's will was "overborne" when she gave statements at the police station. The totality of the circumstances shows that Defendant's admissions at the station were voluntary. She had a voluntary, noncustodial interaction with

15

Trooper Ford in her own home. This interaction involved no threats, physical harm, or intimidation. Rather, she and Trooper Ford had a calm, courteous conversation once he determined that she was a suspect in this matter. She was advised multiple times that she was not under arrest and did not have to cooperate. That interaction flowed into the admissions made at the police station, where there is also no evidence presented of coercion or intimidation. The mere fact that Defendant was 18 years old and not well educated is insufficient to show that Defendant's statements made at the police station were not voluntary.

Lastly, Defendant argues that her statements made at the police station must be suppressed because her waiver of *Miranda* rights was not voluntary, knowing, or intelligent. To be valid, the relinquishment of *Miranda* rights must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Pruden*, 398 F.3d 241, 246 (3d Cir. 2005) (quoting *Moran*, 475 U.S. at 421). "Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Pruden*, 398 F.3d at 246 (quoting *Moran*, 475 U.S. at 421) (internal quotation marks omitted). The criteria for assessing the voluntariness of an individual's waiver of her *Miranda* rights "are the same for determining the voluntariness of statements generally." *United States v. Briscoe*, 69 F.Supp.2d 738, 742 (D.V.I. 1999), aff'd in part, rev'd in part on other grounds, 234 F.3d 1266 (3d Cir. 2000); *see United States v. Tyler*, 164 F.3d 150, 158 (1998) (assessing the voluntariness of defendant's waiver). Especially relevant to the totality of the circumstances analysis with respect to a waiver are "the background, experience, and conduct of the suspect." *United States v. Velasquez*, 885 F.2d 1076, 1086 (3d Cir. 1989)

(citing *Bradshaw*, 462 U.S. at 1046). The government bears the "heavy burden" of proving a waiver was voluntary. *Miranda*, 384 U.S. at 475.

For the same reasons discussed above regarding Defendant's post-warning statements, Defendant voluntarily waived her *Miranda* rights. The circumstances in her home were not coercive and were non-custodial. She was *Mirandized* at the police station and signed a Polygraph Rights Warning and Consent Form that clearly informed her that she had an absolute right to remain silent, have an attorney present and stop questioning at any time. *See* Gov't Exh. 2. This consent form also stated that she was voluntarily submitting to a polygraph without force, duress, threats or coercion. *Id.* Further, even considering Defendant's age, the totality of the circumstances shows that Defendant's waiver of her *Miranda* rights was voluntary.

## III. CONCLUSION

For all of the reasons set forth above, I find that Defendant's Motion to Suppress Physical Evidence and Statements should be denied.